IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

  **v.**                                                      CRIMINAL NO. 1:21-CR-17
                                                                     (KLEEH)

**EARVIN MOTT,**

    **Defendant.**

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION
[ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

Pending before the Court is a Report and Recommendation ("R&R") by United States Magistrate Judge Michael J. Aloi. The Magistrate Judge recommends that the Court deny the motion to suppress filed by Defendant Earvin Mott ("Mott"). For the reasons discussed below, the Court **REJECTS** the R&R and **GRANTS** the motion to suppress.

## I.  FACTS

The Court finds the following facts based on the testimony from Mon Metro Task Force Officer Cooper ("TFO Cooper") during the suppression hearing, the exhibits to the hearing, and the parties' briefs. On October 5, 2020, Task Force members were looking to arrest Loren Delaney ("Delaney"), for whom five active felony state warrants were pending. The Task Force received information that Delaney was staying at the Scholar Hotel in downtown Morgantown, West Virginia, with Mott. Staff at the Scholar Hotel provided

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

video footage to the Task Force. On the video footage, officers observed Delaney with a black male who matched the description of Mott and was later determined to be Mott. Officers discovered that Delaney was driving a white Kia sedan, which was registered in her name. Hotel staff advised law enforcement that they had observed the Kia nearby. They also advised that Mott had rented Room 203, and no rooms were rented under Delaney's name. The previous day, according to hotel staff, Delaney had extended the rental of Room 203 until October 10, 2020.

The video footage showed Delaney and Mott leaving their room, placing a bag of trash in a receptacle in the hallway, and leaving the hotel. Officers searched the trash bag, in which they found evidence of illegal narcotic sales and distribution. Law enforcement prepared a search warrant for Room 203 because Delaney's vehicle was gone and the surveillance indicated that she had left. The search warrant was never executed, though. The Task Force did not execute the arrest warrants on Delaney that day because her vehicle was no longer parked near the Scholar Hotel.

In late October 2020, officers were engaged in a "round-up" of individuals indicted in the Anthony Allen[1] case, which included Delaney. In efforts to locate Delaney, the Task Force began a

---

[1] This criminal case is pending in the Northern District of West Virginia, Case No. 1:20-CR-74, and it includes 25 defendants.

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

practice of searching hotel parking lots for evidence of her because she was known to be in hotel rooms and to use hotel rooms as locations to exchange sexual favors for drugs.

On October 27, 2020, the Task Force learned that Delaney's white Kia was parked at the Courtyard by Marriott (the "Courtyard"). At that point, one officer remained with the Kia while another officer went inside and spoke with hotel staff. The officer gave hotel staff a description of Delaney and asked if anyone was staying at the hotel who matched that description and might be utilizing the white Kia in the parking lot. Staff confirmed that the description matched the individual who had been driving the white Kia. Law enforcement did not provide hotel staff with a photograph.

The officer asked hotel staff if Mott was currently renting a room at the Courtyard. He asked this because he knew that Mott and Delaney had previously stayed together at the Scholar Hotel. Hotel staff confirmed that Mott had rented Room 408 and that Room 408 was solely registered to Mott. Delaney was not registered at any room in the hotel. No illegal conduct was suspected or observed with respect to Room 408. Officers never saw Delaney coming and going from the room. They never saw her go out to her car and return to the room. They never saw her in the hotel at all until they entered Room 408. TFO Cooper was unaware whether

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

Delaney had rented a room under her name at the Courtyard at any time in the past.

Officers had previously run a NCIC[2] search on Mott, which revealed that he had a dangerous criminal history, including a charge for "literal murder."[3]  After learning that Mott had rented Room 408, the Task Force converged on the hotel to cover all points of egress.  No search warrant or no-knock warrant was obtained.  At that time, the Task Force did not have any warrants related to Mott — search warrants, arrest warrants, or otherwise.

At approximately 1:00 p.m., law enforcement made entry into Room 408 to arrest Delaney.  Officers knocked on the door and identified themselves as law enforcement, but no one asked if Delaney was present or if Delaney could make herself available in the hallway.  More than five officers made entry, and officers broke the locks on the doors.  Upon entry, officers observed that Mott was walking toward them with his hands up, and Delaney was half-asleep on the bed.  Neither Delaney nor Mott gave officers consent to enter the room.  Mott was not given any Miranda warnings.  In plain view after they entered the room, officers observed marijuana, a loaded syringe, and packaging materials.

---

[2] "NCIC" refers to the National Crime Information Center.
[3] TFO Cooper used the phrase "literal murder" in his testimony and indicated that "literal murder" was what had come up on the NCIC search.

Case 1:21-cr-00017-TSK-MJA Document 38 Filed 03/28/22 Page 5 of 19 PageID #: 178

USA V. MOTT                                                                1:21-CR-17

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

Law enforcement then obtained a written search warrant for Room 408, the White Kia, and a red Jeep.[4] Officers did not obtain a search warrant prior to entry because, as TFO Cooper testified, "the [Kia] was currently there" and they had "probable cause to believe that a wanted fugitive was inside Room 408."

Officers then executed the search warrant upon Room 408. They recovered a large amount of a substance later determined to be fentanyl, as tested by the West Virginia State Police Lab; two firearms; and a large sum of cash. Based on the evidence seized after the entry and subsequent search, a grand jury in the Northern District of West Virginia charged Mott with Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); Possession of a Firearm in Furtherance of a Drug Offense, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1)(A)(i); and Unlawful Possession of Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Mott has moved to suppress the evidence against him, arguing that the entry into Room 408 was in violation of the Fourth Amendment to the United States Constitution.

---

[4] After entering Room 408, officers conducted a pat-down of Mott and found a rental vehicle key belonging to a Jeep. Law enforcement then located a red jeep in the parking lot that was parked next to Delaney's white Kia.

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

## II.   REPORT AND RECOMMENDATION

In the R&R, the Magistrate Judge recommended that the motion to suppress be denied. The Magistrate Judge found that the entry into Room 408 was lawful because officers had probable cause to believe (1) Delaney was residing in the room and (2) Delaney would be found in the room at that time. The Magistrate Judge further found that even if the search warrant was defective, the good-faith exception under Leon applies. Finally, the Magistrate Judge found that Mott's Fifth Amendment rights were not violated by the officers' failure to give him Miranda warnings.

The R&R advised the parties that they had seven days to file "specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection." The R&R further states that "[f]ailure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals."

## III. OBJECTIONS

In his objections, Mott argued that the Magistrate Judge placed too much emphasis on Mott's criminal history. He also argued that the Magistrate Judge ignored the fact that Delaney had "many current associations[.]" He believes that United States v. Brinkley controls because Delaney could have been in several

6

Case 1:21-cr-00017-TSK-MJA   Document 38   Filed 03/28/22   Page 7 of 19   PageID #: 180

USA V. MOTT                                                      1:21-CR-17

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION
   [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

locations. He objected to the finding that Delaney was residing with Mott. Mott further objected to the Magistrate Judge's finding that Leon applies.

When reviewing a magistrate judge's R&R, the Court must review de novo only the portions to which an objection has been timely made. 28 U.S.C. § 636(b)(1)(C). Otherwise, "the Court may adopt, without explanation, any of the magistrate judge's recommendations" to which there are no objections. Dellarcirprete v. Gutierrez, 279 F. Supp. 2d 600, 603–04 (N.D.W. Va. 2007) (citing Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983)). Here, based on the broad nature of Mott's objections, the Court reviewed the entire R&R de novo.

## IV. ANALYSIS

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." United States v. Wilhelm, 80 F.3d 116, 120 (4th Cir. 1996). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961). Accordingly, "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). Hotel

Case 1:21-cr-00017-TSK-MJA Document 38 Filed 03/28/22 Page 8 of 19 PageID #: 181

USA V. MOTT                                                    1:21-CR-17

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION
    [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

guests are entitled to the same constitutional protections against unreasonable searches and seizures as are residents of a house. See Stoner v. State of Cal., 376 U.S. 483, 490 (1964).

An arrest warrant can sometimes allow officers to enter a home to apprehend a suspect. See Payton v. New York, 445 U.S. 573, 603 (1980); see also United States v. Brinkley, 980 F.3d 377, 384 (4th Cir. 2020). In Payton v. New York, the Supreme Court found that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. 573, 603 (1980). The United States Court of Appeals for the Fourth Circuit, interpreting Payton, applies a two-part test to determine whether law enforcement, when executing an arrest warrant, can enter a home without additionally obtaining a search warrant: the court considers "(1) whether there is reason to believe that the location is the defendant's residence, and (2) whether or not there was a 'reasonable belief' that he would be home." United States v. Hill, 649 F.3d 258, 262 (4th Cir. 2011).

In Hill, the Fourth Circuit declined to define "reasonable belief," but the court later did so in Brinkley, clarifying that it equates to probable cause. 980 F.3d at 384–85. However, to execute an arrest warrant in a third-party's home, absent exigent circumstances or consent, officers must additionally obtain a

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

search warrant before entering. See Steagald v. United States, 451 U.S. 204, 216 (1981).

In Brinkley, the Fourth Circuit explained the reasoning behind treating the entry of a suspect's home differently from the entry of a third-party home:

> When police armed with an arrest warrant seek to enter a suspect's own home, Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), controls. There the Court concluded that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603, 100 S.Ct. 1371. The Payton Court reasoned that an arrest warrant "will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen," so it is not constitutionally necessary for officers to seek additional judicial authorization before entering a suspect's own home to arrest him. Id. at 602–03, 100 S.Ct. 1371.

> But one year later, in Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38, the Court decided that an arrest warrant alone did not authorize police to enter a third party's home. The Court explained that in this situation, unlike in Payton, "two distinct interests" protected by the Fourth Amendment are at stake: not only "[the suspect's] interest in being free from an unreasonable seizure," but also "[the third party's] interest in being free from an unreasonable search." Id. at 216, 101 S.Ct. 1642. While an arrest warrant may adequately protect the former interest, it does "absolutely nothing to protect [the third

Case 1:21-cr-00017-TSK-MJA Document 38 Filed 03/28/22 Page 10 of 19 PageID #: 183

USA V. MOTT                                                    1:21-CR-17

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

> party's] privacy interest in being free from an unreasonable invasion and search of [her] home." Id. at 213, 101 S.Ct. 1642. Consequently, the Steagald Court held that, absent exigent circumstances or consent, the Fourth Amendment requires police to obtain a search warrant before trying to apprehend the subject of an arrest warrant in a third party's home. Id. at 216, 101 S.Ct. 1642.

Brinkley, 980 F.3d at 384.

Probable cause "is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 230 (1983). "The 'quantity and quality' of information known to officers bear on whether they have probable cause, with less reliable information requiring more corroboration." Brinkley, 980 F.3d at 386. "Under this pragmatic, common sense approach, [courts] defer to the expertise and experience of law enforcement officers at the scene." United States v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004). Courts should examine the totality of the circumstances known to law enforcement at the time of entry. See Gates, 462 U.S. at 230.

In determining whether a suspect resides somewhere, officers are not required to know with certainty the suspect's actual residence. See Fialdini v. Cote, 594 F. App'x 113, 118 (4th Cir. 2014) (unpublished) ("[R]equiring actual knowledge of the suspect's true residence would effectively make Payton a dead

Case 1:21-cr-00017-TSK-MJA Document 38 Filed 03/28/22 Page 11 of 19 PageID #: 184
USA V. MOTT                                                      1:21-CR-17

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

letter . . . since [officers] could never be certain that the suspect had not moved out the previous day and that a Bivens or a 42 U.S.C. § 1983 claim would then be made against them by another resident." (citation omitted)). Probable cause, in a sense, equates to a "fair probability." Gates, 462 U.S. at 238.

In Brinkley, law enforcement officers were seeking to execute an arrest warrant, and when determining the suspect's (Brinkley's) whereabouts, multiple addresses arose as possibilities. 980 F.3d at 381. Finally, after ascertaining the identity of Brinkley's girlfriend, officers located the apartment where they believed the girlfriend lived. Id. They went to the apartment, intending to do a "knock-and-talk" and determine whether Brinkley was there. Id. One of the officers admitted that he "'had no idea if [Brinkley] was going to be there that morning,' but thought the . . . apartment was the 'most likely address' to 'find Mr. Brinkley or evidence of his whereabouts.'" Id. at 381–82.

When officers arrived, the woman who answered the door exhibited nervous behavior. Id. at 382. Officers then entered the home without consent, found Brinkley in the home, and arrested him. Id. Prompted by these facts, the Fourth Circuit discussed the differences between Payton and Steagald, as discussed above. Id. at 383–86. The court found that law enforcement lacked probable cause to believe that Brinkley (1) was residing in the

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

apartment and (2) was inside the apartment at the time of entry. Id. at 389, 391–92.

Here, like in Brinkley, law enforcement did not obtain a search warrant before entering Room 408. Therefore, for the entry to have complied with the Fourth Amendment, the officers needed probable cause to believe that Delaney (1) was residing in Room 408 and (2) was inside Room 408 at the time that the officers made entry. The Court finds that officers did not have probable cause to believe that Delaney was residing in Room 408, but they did have probable cause to believe that she was inside Room 408 at the time of entry. Without both, the entry here was unlawful.

**A.   Law enforcement lacked probable cause to believe that Delaney resided in Room 408.**

Brinkley explains that probable cause as to someone's residence exists "if the information sufficed for a person of reasonable prudence to believe that [the suspect] resided there." 980 F.3d at 386. The court cited examples of ways that police can establish reasonable belief, or probable cause, as to a suspect's residence: arrest warrants, postal records, a public database, booking reports, a National Insurance Crime Bureau accident report, credit bureau reports, credit card applications, car registration, electric and water bill in the suspect's name, and verification that the suspect received mail at a certain location.

Case 1:21-cr-00017-TSK-MJA   Document 38   Filed 03/28/22   Page 13 of 19   PageID #: 186

USA V. MOTT                                                    1:21-CR-17

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION
    [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

Id. Still, "probable cause . . . does not require any particular source or kind of information." Id.

Under Brinkley, it is important to distinguish whether a suspect stayed in a home as a resident or was merely an overnight guest. See id. at 387. The court found that when the officers learned the identity of Brinkley's girlfriend and learned that his girlfriend was associated with a certain apartment, the information "certainly provided additional evidence that Brinkley might well have stayed at [his girlfriend's] home, but it did not speak to whether he did so as a resident or as [her] overnight guest." Id. The court also found it important that the officers failed to ask the woman at the door whether Brinkley resided there; they only asked whether he was present. See id. at 388–89. This weighed against a finding that the apartment was Brinkley's residence. See id. (calling this a "critical difference under Steagald"). The court stated that "[t]hough the officers developed a well-founded suspicion that Brinkley might have *stayed* in the . . . apartment at times, they failed to establish probable cause that he *resided* there." Id. at 389.

Here, the record before the Court does not establish probable cause that Delaney resided in Room 408. With respect to establishing Delaney's residence, the case is similar to Brinkley. The evidence indicates that Delaney had a history with Mott, and

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

that she may have stayed in Room 408 with Mott as a guest, but it does not support by probable cause that she resided there. Like in Brinkley, the police did not ask hotel staff whether she resided there; they asked whether she was staying there.

Law enforcement testimony indicates that officers did not try to establish Delaney's actual residence. TFO Cooper testified that he did not believe a search warrant was needed because Delaney's vehicle was on-site and because they had probable cause to believe a wanted fugitive with an arrest warrant was inside Room 408. Instead of trying to locate Delaney's actual residence, if she had one, officers searched hotel parking lots to find Delaney's vehicle, thereby focusing on her presence and ignoring whether locations constituted her residence.

In addition to law enforcement's ignoring the issue of residency, the Government has also repeatedly ignored the issue or misstated the law with respect to the issue. In the Government's response to the motion to suppress, it stated, "It is well settled that an arrest warrant gives law enforcement the authority to enter a residence to effect an arrest if they have reason to believe the defendant is in the residence," citing Payton. ECF No. 30 at 2. This statement of law, however, is only true if the residence is the *defendant's residence*. Otherwise, a search warrant (or exigent circumstances or consent) is required. The Government also stated

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

that there was "probable cause to believe Loren Delaney was in the hotel room" without analyzing whether she resided there. Id.

The Government again ignored the "residence" analysis in its supplemental memorandum, stating that "[t]he officers entered defendant's hotel room because they had an arrest warrant for an individual, Loren Delaney, who they believed was *sharing the room* with defendant." ECF No. 34 at 1. Again, sharing a room is not enough. In the same brief, the Government stated that because the lawfulness of Delaney's arrest warrant has not been challenged, "the issue upon entry is whether the officers had probable cause to believe Delaney was in the hotel room." Id. at 3. This skips, once again, the residence analysis.

Without the important safeguard of establishing probable cause as to Delaney's residency, while an arrest warrant may have adequately protected Delaney's interest, it did "absolutely nothing to protect [Mott's] privacy interest in being free from an unreasonable invasion and search of his home." Steagald, 451 U.S. at 213. All of this, under Brinkley, indicates that officers in this case had only a "limited basis to believe" – if that — that Delaney resided in Room 408. And this is not enough. Like in Brinkley, the officers had only a well-founded suspicion that Delaney might have been staying in Room 408 with Mott. Nothing in the record indicates that this was her residence, as opposed to a

15

Case 1:21-cr-00017-TSK-MJA Document 38 Filed 03/28/22 Page 16 of 19 PageID #: 189

USA V. MOTT                                                    1:21-CR-17

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION
   [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

place that she was staying. The officers did not have probable cause to believe that she resided in Room 408.

**B.  Law enforcement had probable cause to believe that Delaney was inside of Room 408 at the time they made entry.**

Still, while lacking probable cause to find that Room 408 was Delaney's residence, officers had probable cause to believe that Delaney was inside of Room 408 at the time they made entry. They knew that Delaney drove a white Kia sedan that was registered in her name. When officers began their "round-up" of individuals indicted in the Anthony Allen case, which included Delaney, they began a practice of searching hotel parking lots for evidence of her presence. On October 27, 2020, officers learned that Delaney's white Kia sedan was parked at the Courtyard.

After locating Delaney's Kia, one officer remained with the Kia while another went inside to speak with hotel staff. The officer who went inside gave staff a description of Delaney, which staff confirmed matched the individual who was driving the white Kia parked outside. Law enforcement also confirmed that Mott had rented a room at the Courtyard (Room 408).

Officers knew that Delaney and Mott had previously stayed in a hotel room together, they knew that Delaney's vehicle was in the parking lot at the Courtyard, they learned that Mott had rented Room 408 at the Courtyard, and they confirmed with Courtyard staff

16

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

that Delaney's description matched the woman who had been driving the Kia.  All of this gave the officers probable cause to believe that Delaney was inside of Room 408 at the time they made entry.  These facts are easily distinguishable from Brinkley, in which officers admittedly "had no idea" whether the suspect would be inside.  980 F.3d at 381.  In Brinkley, when police arrived at the apartment, they intended to do exactly what was done in this case: obtain confirmation of the suspect's presence.  Yet in Brinkley, there was no confirmation made; here, there was.  The Court finds that there was probable cause to establish that Delaney was in Room 408, but because there was no probable cause to establish that it was her residence, the entry remains unlawful.

C.  **The Leon good-faith exception does not apply because law enforcement's unlawful entry into Room 408 preceded the magistrate's involvement.**

The Leon good-faith exception can serve to salvage an otherwise defective warrant.  See United States v. Leon, 468 U.S. 897 (1984).  In Leon, the Supreme Court held that the exclusionary rule does not bar admission of evidence obtained when officers acted in objectively reasonable reliance on a search warrant that was ultimately found to be invalid.  Id.  "Leon teaches that a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

that the search was illegal despite the magistrate's authorization.'" United States v. Bynum, 293 F.3d 192, 194 (4th Cir. 2002).  In other words, "[u]nder the good faith exception, evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." United States v. Lalor, 996 F.3d 1278 (4th Cir. 1993).

The Leon good-faith exception "only prohibits penalizing officers for their good-faith reliance on the magistrates' probable cause determinations." United States v. Mowatt, 513 F.3d 395, 405 (4th Cir. 2008), abrogated on other grounds, Kentucky v. King, --- U.S. --- (2011).  Leon does not apply to salvage behavior that preceded the magistrate's involvement.  Id.  In short, the Leon exception does not apply here because it was "the officers' unlawful entry . . . that led to [the] request for a search warrant."  Id.  All evidence seized after entry into Room 408 was made must be suppressed.[5]

### V.   CONCLUSION

On October 27, 2020, Mott had a reasonable expectation of privacy in Room 408, which he had rented.  See Stoner, 376 U.S.

---

[5] Because the Court finds that entry into Room 408 was unlawful, it need not address Defendant's assertion that Miranda warnings were not given.

**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION [ECF NO. 35] AND GRANTING MOTION TO SUPPRESS [ECF NO. 28]**

483. Per <u>Brinkley</u>, for law enforcement to enter Room 408 without a search warrant to arrest Delaney, they needed probable cause to believe (1) Delaney resided in Room 408 and (2) Delaney was inside Room 408 at the time it effected entry. Officers lacked probable cause as to the former. Nothing in the record establishes that exigent circumstances existed or that consent was given. Therefore, officers' entry into Room 408 was in violation of Mott's Fourth Amendment rights.

For the reasons discussed above, the Court **ORDERS** the following:

- The R&R is **REJECTED** [ECF No. 35];

- Mott's objections are **AFFIRMED** [ECF No. 36]; and

- The motion to suppress is **GRANTED** [ECF No. 28].

It is so **ORDERED**.

The Clerk is **DIRECTED** to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: March 28, 2022

*Tom S Kleeh*
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA